IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ARTHUR LEE WALTON,

    Petitioner,                   No. CIV S-09-2351 EFB P

    vs.

THE STATE OF CALIFORNIA,

    Respondent.                ORDER

_____/

      Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a 2006 judgment of conviction entered against him in Solano County Superior Court on one count of second degree robbery, with enhancements for personally inflicting great bodily injury and for serving two prior prison terms. He seeks relief on the grounds that: (1) the trial court violated his right to due process in denying his motion to sever his trial from that of his co-defendant; and (2) jury instruction error violated his right to due process. Upon careful consideration of the record and the applicable law, the court finds that petitioner's application for habeas corpus relief must be denied.

////

////

1

## I. Background[1]

These consolidated appeals concern two robberies that occurred in the city of Vallejo, on the night of April 29, 2006. Carlos Trinidad was accosted by a woman, who was soon joined by several other people. Trinidad was knocked unconscious, and had his wallet and cell phone taken. A short while later, a few blocks away, Peter Bedolla was accosted by a woman, who was then joined by several others. Bedolla was hit in the head and robbed. Neither victim was able to identify his attackers, but a few hours after the attack on Trinidad, Darryl Lavon Mitchell (Mitchell) tried to sell Trinidad's cell phone to the victim's stepdaughter. The next day an accomplice gave a statement to the police, and ultimately testified against Mitchell and his codefendant Arthur Lee Walton (Walton) at their joint trial.

Mitchell was charged and convicted of the robbery of Trinidad and Bedolla, but the jury found not true an enhancement allegation pursuant to Penal Code section 12022.7, subdivision (b)[2] with respect to the Bedolla robbery. The jury also found Walton guilty of the Bedolla robbery,[3] and found true the allegation that he personally inflicted great bodily injury.

On appeal, Mitchell contends that his convictions must be reversed because they are based upon uncorroborated accomplice testimony that also was so contradictory and unreliable that it was insufficient to support the jury findings of guilt. He further contends that he was prejudiced by the trial court's failure, sua sponte, to sever the two counts of robbery, and that his trial counsel rendered ineffective assistance by failing to move for severance.

Walton contends the court abused its discretion by denying his motion to sever his trial from Mitchell's, and committed prejudicial error by failing to give a limiting instruction with respect to the evidence that Mitchell possessed the cell phone taken in the Trinidad robbery, and failing to modify another standard instruction on the inferences that may be drawn from possession of stolen property to specify that it applied only to Mitchell.

We shall affirm the judgment as to both defendants.

---

[1] In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the First Appellate District provided the following factual summary.

[2] Statutory references are to the Penal Code unless otherwise stated.

[3] Walton was not charged with the Trinidad robbery.

2

**Facts[4]**

**Trinidad Robbery**

Carlos Trinidad testified that on April 29, 2006, at approximately 8:30 or 9:00 p.m., he was walking home from work in Vallejo. He was carrying his cell phone, $120 in cash, and a check for $950. In the vicinity of Alameda and Florida Streets, a skinny African American woman approached him, but Trinidad kept walking. Trinidad began to run when the woman kept following and yelling. She reached out and grabbed him by his shirt. Then several African American men converged upon him, threw him down and hit him in the head.[5] They ripped his pants near his pocket, and took his wallet, his paycheck and his cell phone. He lost consciousness as a result of the attack, but somehow managed to walk home, and was taken to the hospital. Trinidad told the police he could not identify the people who robbed and beat him.

Trinidad's stepdaughter, Berenice Gaaolegos, testified that she went to the hospital to see her stepfather at about 10:00 p.m. She called Trinidad's cell phone and a man with a Puerto Rican accent answered. She asked him how he got the cell phone, and he said he found it in the street. She pretended that the phone belonged to her, and agreed to pay him a $20 reward if he returned the phone. She then contacted the police, and met with Detective Pucci. While she was at the police station a different person, named Darryl, called her several times, said he wanted $10 for the phone, and wanted to meet in five minutes. Gaaolegos agreed to meet Darryl, and the police followed her to the agreed meeting place. When she arrived at the meeting place in front of a tire store, at approximately 1:30 a.m., Mitchell came over to her with the cell phone. He was arrested by the police after Gaaolegos confirmed that the cell phone belonged to her stepfather.[6]

**Bedolla Robbery**

At about 11:13 that same evening, three Vallejo police officers were dispatched in response to a call about a "man down." They found Peter Bedolla lying on the street in the 1300 block of Sutter

---

[4] Consistent with the standard of review, we summarize the facts in the light most favorable to the judgment.

[5] Trinidad was not sure how many people attacked him, but estimated it was four men.

[6] Although Trinidad accompanied Gaaolegos and the police to the meeting with Mitchell, he was still not feeling well and stayed in the car. He testified that he did not know Mitchell and never gave him permission to have his cell phone.

3

Street, near an alley. Bedolla had suffered head injuries, was unable to speak, and was transported to the hospital. On Kentucky Street, east of the intersection of Sutter and Kentucky, the police found Bedolla's wallet and some of its contents. His cell phone was never recovered.

The police canvassed the area, but were unable to find any witnesses. Bedolla's ex-wife, Cheryl Bedolla, with whom he still resided, testified that she last saw Bedolla at about 9:45 or 10:00 o'clock that evening. The police came to her house at about 3:30 a.m. and told her that Bedolla had been taken to the hospital. They gave her his keys, and she identified the wallet as belonging to Bedolla. As of the time of trial, Bedolla was still hospitalized. He suffered brain damage and was unable to communicate.

The parties stipulated that Bedolla suffered great bodily injury within the meaning of section 12022.7, subdivision (b).

**Accomplice Testimony of Tiffany Gipson**

The day after the robberies, the Vallejo police arrested Tiffany Gipson on unrelated drug charges. Gipson gave a statement to Detective Pucci while she was under the influence of drugs.[7] Gipson testified that she made the statement because the police told her they could make the "dope" disappear, and she wanted to go home. She gave the police the least amount of information she thought was necessary to get released.

Based upon her statement, Gipson was charged with both robberies as a codefendant of Walton and Mitchell. Pursuant to a negotiated plea, she pleaded guilty to the Trinidad robbery. The prosecutor dismissed the second robbery count, and she was promised probation in exchange for her truthful testimony.

Gipson testified that she had known Walton, whose nickname was "Moosie," and Mitchell for a few years. Gipson used crack cocaine with Walton, Mitchell, Belinda Gaitlin, also known as "Joy," and Marcy Thompson, whom Gipson called "Diamond." The five of them were using crack cocaine together on the evening of April 29, 2006. At around 9:00 or 10:00 p.m., Gipson was driving with Diamond in a gray BMW when they saw an Hispanic man walking down Lozier Alley off of Alameda Street. Diamond got out of the car, approached the man, and hit him in the face. Mitchell and Walton came out of a nearby apartment, and assisted Diamond while Gipson remained in the car as a lookout. Joy was also in the alley. Mitchell and Walton patted the man's pockets, but did not hit him. Mitchell and Walton ran back into the apartment building, and Diamond came back to the car. Gipson

---

[7] The two and one-half hour interview of Gipson was videotaped and played for the jury.

4

believed that Diamond got all the cash, but she gave Gipson drugs. Gipson testified that all they took was cash. She did not see a cell phone taken in this robbery.

Gipson and Diamond continued to drive around and use drugs, and a short while later they picked up Mitchell, and then Walton. Joy was also in the car, sitting between Mitchell and Walton. While they smoked crack they developed a plan to have Joy entice a man to an apartment off Sutter Street so they could rob him. Sometime between 10:00 p.m. and midnight, while Diamond, Gipson, Mitchell and Walton were driving around, they saw Joy with an Hispanic man at Carolina and Sutter Streets.[8] Joy did not succeed in getting the man to the apartment, so they drove past her, and Diamond, Walton and Mitchell got out of the car. Gipson remained in the car as a lookout. Diamond took the first swing at the man. After the man fell to the ground, Walton stomped on the man's head numerous times. Mitchell took the man's cell phone, but Gipson did not see him touch the victim. The attack lasted less than 10 minutes. The man was not moving when Diamond, Joy, Mitchell, and Walton returned to the car. Joy took the money out of the man's wallet, and Walton threw the wallet out of the car near a baseball park off of Sutter Street. Joy kept $40, and Diamond, Walton, and Mitchell split the rest. Gipson was given more drugs for being the lookout.

Gipson testified that in her police interview she did not initially mention Walton as one of the robbery participants because he was her friend. Instead, she referred to a "young dude" who did not exist. She did not mention Walton until Detective Pucci brought him up. She also acknowledged that being under the influence of drugs made it difficult for her to remember things clearly.

**Tamika Darnes**

Tamika Darnes had been dating Walton for several months before April 29, 2006. On April 17, 2006, she was stabbed by a person she described only as a "Mexican." She and Walton had a rocky relationship, and around the time the robberies occurred, Darnes was facing a misdemeanor battery charge involving Walton.

Darnes first met Detective Pucci while he was investigating the stabbing incident. Then, on May 2, when Detective Pucci asked if she knew anything about why the police were looking for Walton, she told him she had only heard on the street that he was hiding

---

[8] Bedolla was found at Sutter and Kentucky Streets. In her videotaped interview and in the testimony at trial, Gipson maintained that the second robbery was at Sutter and Carolina Streets, which was about three blocks away from the intersection where the police found Bedolla.

5

> from the police. On May 9, Darnes told Detective Pucci that, in a telephone call, Walton had told her he had been in a car on Sutter Street, and had jumped out of the car when he saw Joy in an altercation with a Mexican. Walton said he hit the man and the man passed out. When Darnes brought the incident up again later, Walton denied it. Darnes believed Diamond was also involved, and she suspected Diamond had a relationship with Walton beyond the brother-sister type of relationship he claimed to have with Diamond.
>
> At Detective Pucci's request, Darnes made a recorded call to Walton. During the call, Darnes asked if Walton remembered telling her about how he "hit that Mexican on the street," and whether he knew the man was in the hospital. Walton denied that he told her he hit anybody. He said he knew about it, but that he was not there, and other people did it. The rest of the call concerned an argument over Darnes's accusation that Walton was spending time with Diamond, and Walton's denial. Eventually, he hung up on her.
>
> Darnes testified that the conversation she had with Walton that she described in her videotaped statement, in which he said he hit the Mexican, had occurred before she was stabbed. She told Detective Pucci about it because she believed she had been stabbed in retaliation for Walton's attack on another Mexican. She did not want to testify against Walton at trial, but was under subpoena.[9]
>
> **Other Police Investigation**
>
> Peter Bedolla's cell phone was never recovered. Detective Pucci acknowledged that he used harsh interrogation techniques with Gipson in the videotaped interview because Bedolla's condition was grave, and, at the time of the interview, they had no information about who was responsible. A search of Walton's last known address revealed nothing of evidentiary value.
>
> Detective Pucci also went to the known crack house at 1308 Sutter and attempted to interview Joy, but she would not talk. Detective Pucci also spoke to an unidentified man of Spanish descent who was present.

Answer, Ex. F (hereinafter Opinion), at 1-7.

////

////

---

[9] Darnes and Walton were engaged, but their plans to be married before the sentencing in this case were administratively delayed.

6

After his conviction was affirmed by the California Court of Appeal, petitioner filed a petition for review in the California Supreme Court. Answer, Ex. G. That petition was summarily denied. Answer, Ex. H.

## II.   Analysis

### A. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. *Early v. Packer*, 537 U.S. 3, 7 (2002) (*citing Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the

7

1  Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's
2  case. *Williams*, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because
3  that court concludes in its independent judgment that the relevant state-court decision applied
4  clearly established federal law erroneously or incorrectly. Rather, that application must also be
5  unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75
6  (2003) (internal citations omitted) (it is "not enough that a federal habeas court, in its
7  independent review of the legal question, is left with a 'firm conviction' that the state court was
8  'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas
9  relief so long as 'fairminded jurists could disagree' on the correctness of the state court's
10 decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

11    If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing
12 court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,
13 527 F.3d 919, 925 (9th Cir. 2008). *See also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)
14 (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §
15 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by
16 considering de novo the constitutional issues raised.").

17    The court looks to the last reasoned state court decision as the basis for the state court
18 judgment. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state
19 court decision adopts or substantially incorporates the reasoning from a previous state court
20 decision, this court may consider both decisions to ascertain the reasoning of the last decision.
21 *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim
22 has been presented to a state court and the state court has denied relief, it may be presumed that
23 the state court adjudicated the claim on the merits in the absence of any indication or state-law
24 procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85 (2011). That
25 presumption may be overcome by a showing "there is reason to think some other explanation for
26 the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

8

803 (1991)). However, when it is clear that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Id.* Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

**B. Petitioner's Claims**

**1. Jury Instructions**

Petitioner claims that the trial court violated his right to due process when it failed to give a limiting instruction with regard to evidence that co-defendant Mitchell possessed Trinidad's stolen cell phone. Pet. at 24-26.[10] He contends that the jury might have improperly used this evidence to find him guilty of the Bedolla robbery, especially since the evidence of his guilt of that robbery was "slight." *Id.* He argues, "it was highly likely that the jury . . . convicted both defendants based on Mitchell's possession of the cell phone." *Id.* at 26.

The California Court of Appeal rejected this claim, reasoning as follows:

> Walton raises two issues on appeal. First, he contends that the court abused its discretion by denying his motion to sever his trial from Mitchell's, and that the denial of his motion to sever resulted in a violation of his due process right to a fair trial. Second, he contends that the court erred by refusing to give a limiting

---

[10] Page number citations such as these are to the page number reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

9

instruction with respect to evidence of Mitchell's possession of Trinidad's cell phone. He argues that this refusal coupled with the use of the word "defendant" in portions of CALCRIM No. 376 on possession of stolen property, requires reversal because the jury could have understood these instructions to permit it to find Walton guilty of the Bedolla robbery based upon Mitchell's possession of Trinidad's phone.

We shall address the claim of instructional error first because Walton also relies upon this claim of error in support of his contention that denial of the motion to sever resulted in a violation of his due process right to a fair trial.

**1. CALCRIM No. 376 and Refusal to Give CALCRIM No. 304**

The court gave the following instruction pursuant to CALCRIM No. 376 on possession of stolen property: "If you conclude that the defendant, Darryl Mitchell, knew he possessed property, and you conclude that the property had in fact been recently stolen, you may not convict the defendant of Penal Code Section 211, robbery, based on those facts alone. [¶] However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove that he committed Penal Code Section 211, robbery. [¶] The supporting evidence need only be slight and need not be enough by itself to prove guilt . . . . You may consider how, where and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt of Penal Code Section 211, robbery."

Walton initially requested that the court also give CALCRIM No. 304, which states: "I instructed you during the trial that certain evidence was admitted only against [a] certain defendant[s]. You must not consider that evidence against any other defendant." When the parties conferred on instructions with the court, the court did not include this instruction. After reviewing the packet and making several changes, the court asked whether either party had anything to add, or objections to state. Walton's defense counsel did not object to the omission of CALCRIM No. 304. The court ultimately did not give that instruction.

Walton contends it was error to refuse to give CALCRIM No. 304, and that this error, combined with the references in CALCRIM No. 376 to "defendant," without specifying which defendant, rendered it highly likely that the jury considered Mitchell's possession of Trinidad's cell phone as evidence that Walton was guilty of the Bedolla robbery.

A trial court has no sua sponte duty to give a limiting instruction such as CALCRIM No. 304, but in a trial involving multiple defendants, when evidence is admissible "as to only one defendant,

10

the trial court's failure to give a requested limiting instruction constitutes error." (*People v. Miranda* (1987) 44 Cal.3d 57, 83, *reversed on other grounds by People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.) Although the record is equivocal on the question whether the court refused CALCRIM No. 304, or whether the request was withdrawn, we shall assume arguendo that the court refused to give it and that this was error. Any error in refusing this instruction did not, however, result in prejudice to Walton because other instructions given conveyed essentially the same point. CALCRIM No. 304 relates the more general instruction set forth in CALCRIM No. 303 that evidence admitted for a limited purpose may only be considered for that purpose, to a specific circumstance involving multiple defendants when evidence is admissible only as to a particular defendant. The court gave the more general CALCRIM No. 303 *and* CALCRIM No. 203, which instructs the jury to "separately consider the evidence as it applies to each defendant. You must decide each charge for each defendant separately." These two instructions, when read together, convey essentially the same point as CALCRIM No. 304. Since Walton was not charged with the robbery of Trinidad, the jury, under the instructions given, would have considered Mitchell's possession of property stolen from Trinidad as evidence of only Mitchell's guilt of the Trinidad robbery.

Nor is there any "reasonable likelihood" that the jury would have understood CALCRIM No. 376 to apply to Walton, or to mean that, contrary to CALCRIM Nos. 203 and 303, it could consider evidence that Mitchell possessed Trinidad's cell phone as evidence that *Walton* committed the *Bedolla* robbery. (*See Estelle v. McGuire* (1991) 502 U.S. 62, 72; *see also People v. Kelly* (1992) 1 Cal.4th 495, 525 ["the question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts"].) In light of the opening sentence of CALCRIM No. 376 explicitly identifying "defendant Darryl Mitchell," no reasonable juror would conclude, simply because the subsequent references to "defendant" did not repeat this identification, that the instruction also applied to Walton. By its terms, CALCRIM No. 376 applied only if the jury concluded that defendant "*Darryl Mitchell* knew he possessed property" (italics added) that was recently stolen. The only evidence of possession of recently stolen property involved Mitchell, and the evidence was that Mitchell possessed a cell phone taken from Trinidad. Walton was not charged with the robbery of Trinidad. Therefore, to interpret CALCRIM No. 376 to permit the jury to convict Walton of the Bedolla robbery based upon evidence that Mitchell possessed Trinidad's property, the jury would have had to disregard CALCRIM Nos. 203 and 303. Moreover, in substance, CALCRIM No. 376 cautions the jury *against* inferring guilt based solely upon the defendant's conscious possession of recently stolen goods. It would be unreasonable and illogical for the jury to construe this instruction to also *permit* it to infer guilt of *different* defendant, who *did not* possess the stolen

11

> property, and who is not even charged with the robbery in which the property was taken.
>
> For the foregoing reasons, we find no reasonable likelihood that the jury would construe CALCRIM No. 376 in the manner defendant suggests. Any reasonable jury would correlate the reference in the first paragraph of CALCRIM No. 376 to "defendant Darryl Mitchell" with the remaining references to "defendant" in the subsequent paragraphs. (*See People v. Speegle* (1997) 53 Cal.App.4th 1405, 1413 [court rejected argument that jury would understand instruction based upon reading subsequent paragraphs without reference to preceding paragraphs, and held a "reasonable juror necessarily will correlate" a reference to "act or omission" in the final paragraph of an instruction with a list of elements in the second paragraph].)

Opinion at 20-22.

In general, a challenge to jury instructions does not state a federal constitutional claim. *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983). In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)). In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)). Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). Where the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155

(1977). *See also Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (same).

Upon review of the jury instructions, this court concludes that petitioner's trial was not rendered fundamentally unfair because of the trial court's failure to give a limiting instruction with respect to evidence that co-defendant Mitchell was in possession of Trinidad's stolen cell phone. As noted by the state appellate court, the instructions as a whole conveyed "essentially the same point" as the limiting instruction requested by petitioner. Further, the language of CALCRIM No. 376 clearly refers only to Mitchell's possession of Trinidad's cell phone and Mitchell's participation in the Trinidad robbery. There is no reasonable likelihood that the jury interpreted this instruction to allow it to consider Mitchell's possession of Trinidad's cell phone as evidence that petitioner committed the Bedolla robbery. In short, the decision of the California Court of Appeal rejecting petitioner's jury instruction claim is not contrary to or an unreasonable application of the federal due process principles set forth above. Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2. **Motion to Sever**

Petitioner also claims that the trial court violated his right to due process by denying his motion to sever his trial from that of co-defendant Mitchell. Pet. at 4. He argues that proof of his guilt "rested almost entirely" on his association with Mitchell and Mitchell's actions in the Trinidad robbery, with which he was not charged. *Id.*

The California Court of Appeal rejected these arguments, reasoning as follows:

> **2. Denial of Walton's Motion to Sever**
>
> Walton contends that the court abused its discretion in denying his pretrial motion to sever his trial from Mitchell's. He argues that the court should have granted the motion based upon Walton's contention that he would be prejudiced by the stronger case against Mitchell with respect to the Trinidad robbery. He further contends that, even if the court did not abuse its discretion in denying the severance motion, the joint trial resulted in a gross unfairness and a violation of his due process rights because the prosecutor's closing argument relied on the fact that Mitchell possessed property stolen in the Trinidad robbery to obtain Walton's conviction of the Bedolla robbery. He argues the prejudice flowing from the

13

prosecutor's argument was compounded by the foregoing claimed instructional errors we have already found unpersuasive.

"[D]enial of a motion for severance is reviewed for abuse of discretion." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41.) The reviewing court assesses the ruling based on the record before the trial court at the time. (*People v. Arias* (1996) 13 Cal.4th 92, 127; *People v. Price* (1991) 1 Cal.4th 324, 388.) Of course, even a ruling that was correct when made cannot stand if joinder caused such "'"gross unfairness"'" as to violate defendants' due process rights." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 998.)

The court did not abuse its discretion in denying Walton's motion to sever. Section 1098 states in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials." In light of this legislative preference for joinder, separate trials are usually ordered only " 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*People v. Turner* (1984) 37 Cal.3d 302, 312, *overruled on other grounds in People v. Anderson* (1987) 43 Cal.3d 1104, 1115, quoting *People v. Massie* (1967) 66 Cal.2d 899, 917, fns. omitted.) The charges against Walton and Mitchell were properly joined because the robberies occurred on the same evening in the same area, had participants in common, and had several witnesses in common, including Tiffany Gipson.

Walton's pretrial motion to sever was based primarily on his concern that a videotaped statement Mitchell had made to the police regarding how he came to be in possession of Trinidad's cell phone, which also implicated Walton in both robberies, would be admitted.[11] He argued that Mitchell's statement could not be redacted, and therefore *People v. Aranda, supra*, 63 Cal.2d 518 and *Bruton v. United States, supra*, 391 U.S. 123 (hereafter *Aranda-Bruton*) required that their trials be severed. This *Aranda-Bruton* ground for severance was eliminated by the prosecution's agreement that it would only introduce Mitchell's statement if Mitchell took the stand and testified. The court stated it would then hold an Evidence Code section 402 hearing to determine whether Mitchell's statement could be redacted.

---

[11] Mitchell's videotaped statement was not introduced at trial and is not part of the record on appeal. In the motion to sever, defense counsel represented that in this statement Mitchell initially asserted he obtained the cell phone from a Mexican named Hector, but later stated that the cell phone must have come from "Moosie," which the police later learned was a nickname for Walton.

14

> Walton's counsel agreed that, on these conditions, there would be no *Aranda-Bruton* issue.[12] Walton does not challenge that concession on appeal.
>
> The only other ground for severance Walton asserted was that the evidence against Mitchell was stronger because Mitchell was found in possession of Trinidad's cell phone, whereas there was no physical evidence linking Walton to the Bedolla robbery. Walton argued that in a joint trial he would be convicted based upon his association with Mitchell, instead of the evidence against him, and the relatively weak case against Walton would be bolstered by the evidence of Mitchell's possession of Trinidad's cell phone. The disparity in the strength of the case against Mitchell, however, related to the Trinidad robbery, and only Mitchell was charged with that offense. With respect to the Bedolla robbery, the strength of the evidence against Mitchell and Walton was essentially the same: There was no physical evidence linking either Walton or Mitchell to the crime, and no eyewitness identification. The primary evidence against both men was Gipson's testimony. The court therefore could have reasonably concluded that a joint trial did not pose a significant risk that Walton would be convicted based upon the spillover effect of stronger evidence against Mitchell. Also, when severance would result in "presentation of much the same evidence and witnesses" in each trial, judicial economy is a factor weighing in favor of a joint trial. (*People v. Keenan* (1988) 46 Cal.3d 478, 501.) It was within the court's discretion to balance the substantial benefits of joinder in this case against the minimal risk of prejudice to Walton, and conclude that the benefits of joinder outweighed the risk of potential prejudice to defendant. (*Id.* at p. 502.)
>
> Nor are we persuaded that the joint trial resulted in "'a gross unfairness'" that deprived Walton of "'a fair trial or due process of law.'" (*People v. Cleveland* (2004) 32 Cal.4th 704, 726.) The portions of the prosecutor's closing argument that defendant cites, when read in context, do not support his assertion that the prosecutor's closing argument relied on the fact that Mitchell possessed property stolen in the Trinidad robbery to prove Walton's guilt in the Bedolla robbery. Defendant cites the prosecutor's argument that the "only explanation" for Mitchell's possession of Trinidad's cell phone was that it was taken in the Trinidad robbery "when Mr. Mitchell and Mr. Walton were going through Mr. Trinidad's pockets." Despite the passing reference to

---

[12] *Aranda-Bruton* and their progeny provide that "if the prosecutor in a joint trial seeks to admit a nontestifying codefendant's extrajudicial statement, either the statement must be redacted to avoid implicating the defendant or the court must sever the trials." (*People v. Hoyos* (2007) 41 Cal.4th 872, 895.) When the codefendant testifies and is available for cross-examination, however, his or her "extrajudicial statement implicating another defendant need not be excluded." (*Id.* at p. 896.)

15

Walton, it is quite clear in context that this argument was not advanced in support of finding Walton guilty of the Bedolla robbery. The prosecutor was anticipating Mitchell's possible defense argument, based upon Gaaolegos's testimony that when she first called her stepfather's phone a Puerto Rican man answered, and that Mitchell therefore could have innocently obtained the phone from the Puerto Rican man. The excerpted portion defendant cites was directly preceded by argument in which the prosecutor asked the jury, in "regards to *Darryl Mitchell and the first robbery* . . . to keep this thought in your mind and try to answer the question: How did Mr. Mitchell get Carlos Trinidad's phone?" (Italics added.) It was followed by the argument that "the only reasonable explanation of how *Darryl Mitchell* got that cell phone was that *he* was involved with the first robbery (italics added)." It was obvious in context that the entire argument related only to *Mitchell* and the evidence of *his* guilt in the robbery of Trinidad.

As another example of prosecutorial argument blurring the lines between the two robberies and the two defendants, Walton cites another portion of argument in which he asserts the prosecutor asked the jury to convict the "defendants" based upon Gipson's testimony, Tamika Darnes's statement, and Mitchell's possession of Trinidad's phone. The prosecutor argued: "You can find the defendants guilty, given Ms. Gibson's statement; . . . . you have the testimony of Ms. Gipson; you have Tamika Darnes's videotaped statement; you have Mr. Mitchell, the night of this robbery, having the robbery victim's property on him." Again, read in context, it is clear the prosecutor referred to the "defendants" collectively because he was summing up for the jury the evidence that would support convictions of each defendant of the charges against them. Gipson's testimony was the main piece of evidence against each of them. The reference to Darnes and to Mitchell's possession of the cell phone simply related back to the prosecutor's argument regarding the need for corroboration of accomplice testimony, and was a shorthand reference to more detailed argument he had made that Darnes's statement corroborated Gibson's testimony as to Walton's involvement in the Bedolla robbery, and that Mitchell's possession of Trinidad's cell phone corroborated her testimony regarding Mitchell's involvement in the robberies.

Finally, our analysis of Walton's claim of instructional error, *ante*, disposes of Walton's argument that the prejudice flowing from the prosecutor's argument was compounded by the use of the term "defendant" in CALCRIM No. 376 without specifying that evidence of possession of recently stolen property pertained only to Mitchell, and the failure to instruct the jury that the evidence of Mitchell's possession of stolen property should be considered only in deciding Mitchell's guilt.

16

> For the foregoing reasons, we conclude that the trial court did not abuse its discretion in denying Walton's pretrial motion to sever his trial from Mitchell's, and the record does not support Walton's assertion that the joint trial deprived him of his right to a fair trial.

Opinion at 22-26.

A court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial. *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993) (court must decide if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991) (same). *See also Comer v. Schiro*, 480 F.3d 960, 985 (9th Cir. 2007) (in the context of the joinder of counts at trial, habeas relief will not be granted unless the joinder actually rendered petitioner's state trial fundamentally unfair and therefore violative of due process). Petitioner bears the burden of proving that the denial of severance rendered his trial fundamentally unfair, *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997), and must establish that prejudice arising from the failure to grant a severance was so "clear, manifest, and undue" that he was denied a fair trial. *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir. 1996)). On habeas review, federal courts neither depend on the state law governing severance, *Grisby*, 130 F.3d at 370 (citing *Hollins v. Dep't of Corrections, State of Iowa*, 969 F.2d 606, 608 (8th Cir. 1992)), nor consider procedural rights to a severance afforded to criminal defendants in the federal criminal justice system. *Id.* Rather, the relevant question is whether the state proceedings satisfied due process. *Id.*; *see also Cooper v. McGrath*, 314 F. Supp.2d 967, 983 (N.D. Cal. 2004).

////

1  After a review of the record, this court agrees with the California Court of Appeal that
2 the trial court's failure to sever petitioner's trial from Mitchell's trial did not result in a
3 miscarriage of justice. The mere fact that evidence was introduced regarding the Trinidad
4 robbery, a crime that petitioner was not charged with, did not constitute a due process violation.
5 *See United States v. Matta-Ballesteros*, 71 F.3d 754, 770-71 (9th Cir. 1995) (upholding trial
6 court's denial of defendant's motion for severance from co-defendants, even though evidence
7 was introduced at trial involving three homicides and marijuana enterprise with which defendant
8 was not involved); *United States v. Escalante*, 637 F.2d 1197, 1201-02 (9th Cir. 1980)
9 (upholding denial of severance, even though evidence relating to co-defendant's connection to
10 organized crime and participation in murder was admitted). The jurors were instructed to limit
11 their consideration of evidence regarding the Trinidad robbery to the charges against Mitchell.
12 They were was also instructed that the Government had the burden of proving beyond a
13 reasonable doubt that each defendant committed the crimes with which he was charged (Answer,
14 Ex. A at 164); that it must "separately consider the evidence as it applies to each defendant" (*id.*
15 at 168); that it must "decide each charge for each defendant separately" (*id.*); that opening and
16 closing arguments are not evidence (*id.* at 165); and that "nothing that the attorneys say is
17 evidence." *Id.* at 169. These instructions were sufficient to ameliorate any prejudice to
18 petitioner resulting from the receipt of evidence concerning Mitchell's commission of the
19 Trinidad robbery in their joint trial. *See Zafiro*, 506 U.S. at 541 (finding similar jury instructions
20 sufficient to cure any prejudice arising from joint trial of defendants with antagonistic defenses);
21 *United States v. Nelson*, 137 F.3d 1094, 1108 (9th Cir. 1998) ("the risk of prejudice posed by
22 joint trials can be cured by proper jury instructions"). With respect to the Bedolla robbery, the
23 evidence against both defendants was of relatively equal strength. The court also concludes that
24 the prosecutor's closing argument, when viewed in context and in full, did not contribute to any
25 unfairness with regard to the joinder of petitioner's trial with Mitchell's.
26 ////

The decision of the state courts that petitioner's right to due process was not violated by the denial of his motion to sever is not contrary to or an unreasonable application of federal law. Accordingly, petitioner is not entitled to relief on that claim.

### III. Conclusion

For all of the foregoing reasons, IT IS HEREBY ORDERED that:

1. Petitioner's application for a writ of habeas corpus is denied.

2. The Clerk is directed to close the case.

3. The court declines to issue a certificate of appealability.

DATED: December 8, 2011.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE